IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI`I

| | |
|---|---|
| MONICA TOGUCHI, individually and as the personal representative of the estate of Charles Anthony Lee, II,<br><br>Plaintiff,<br><br>vs.<br><br>KATHRYN MATAYOSHI, *et al.*,<br><br>Defendants. | CIVIL NO. 13-00380 DKW-KSC<br><br>**ORDER DENYING DEFENDANTS' MOTION TO DISMISS COUNT 1 AND GRANTING DEFENDANTS' MOTIONS TO DISMISS COUNT 2** |

**ORDER DENYING DEFENDANTS' MOTION TO DISMISS COUNT 1 AND GRANTING DEFENDANTS' MOTIONS TO DISMISS COUNT 2**

Monica Toguchi holds various State of Hawai'i defendants responsible in their official and individual capacities for the suicide of her son, Charles Anthony Lee, II ("Charlie"). Charlie was diagnosed with specific disabilities and certified for special education by the State. In her Second Amended Complaint ("SAC"), Toguchi asserts the following two claims: (1) discrimination based on violation of Section 504 of the Rehabilitation Act against all defendants in their official

capacities; and (2) Intentional Infliction of Emotional Distress ("IIED") against certain defendants in their individual capacities.[1]

Defendants moved to dismiss both counts for failure to state a claim (Dkt. Nos. 96, 97, and 98). The Court concludes that the Section 504 claim meets the pleading specificity required by the Federal Rules. Count 2, however, fails to individually plead allegations that would support an IIED claim under Hawai'i law. Accordingly, the Court denies defendants' motion to dismiss Count 1 (Dkt. No. 96) and grants the individual capacity defendants' motions to dismiss Count 2 (Dkt. Nos. 97 and 98) with prejudice.

## BACKGROUND

On December 31, 2014, this Court granted defendants' motions to dismiss and for judgment on the pleadings with regard to Toguchi's First Amended Complaint ("FAC"). Dkt. No. 90 ("December Order"). In doing so, the Court granted leave to amend Toguchi's Section 504 and IIED claims.

On January 30, 2015, Toguchi filed the SAC, which contains much of the same factual allegations as the FAC. Dkt. No. 93. The allegations are summarized below.

Shortly after moving to Hawai'i in 2007, Charlie began attending fifth grade at Mililani Uka Elementary School. SAC ¶ 21. Toguchi alleges that she requested

---

[1] Although the SAC includes an IIED claim against Kathryn Matayoshi in her individual capacity, Toguchi concedes the dismissal of that claim against Matayoshi. Dkt. No. 104 at 9.

2

special education services for Charlie, who had a difficult time adjusting to both his new life in Hawaiʻi and to Mililani Uka.  SAC ¶ 21.  Charlie subsequently qualified for individualized special education and related services under the Individuals with Disabilities Education Act ("IDEA") and the Rehabilitation Act from the Department of Education ("DOE") and the Department of Health ("DOH").  SAC ¶ 22.

Charlie began cutting himself in seventh grade while at Mililani Middle School.  SAC ¶ 24.  As a result, Charlie was hospitalized for two months at the Queen's Medical Center's Family Treatment Center, which is "designed only to diagnose and stabilize children and then refer them to appropriate long term programs for subsequent treatment."  SAC ¶ 27.  Toguchi alleges that "Charlie was diagnosed with and treated for severe chronic depression with the specific feature of self-injurious and potentially suicidal behaviors, as well as an obsessive-compulsive disorder with continuing concerns about self-injurious behaviors."  SAC ¶ 28.  During his eighth grade year, Charlie received in-home intensive therapy from the DOH, which Toguchi alleges the defendants knew or should have known was "insufficient and inappropriate to meet Charlie's needs and exposed him to risks of harm because his serious medical needs were not being met."  SAC ¶ 34.  During this time, Toguchi had regular meetings with Charlie's Individual Education Program ("IEP") team and "requested that Charlie receive intensive,

focused mental health treatment in a suitable residential placement . . . ." SAC ¶ 34. Toguchi claims that the only appropriate placement for Charlie was a mainland residential facility, but the defendants failed and refused to even consider placing Charlie in one due to the cost. SAC ¶¶ 36-37.

Toguchi alleges that Charlie's behavioral problems escalated and that the defendants were aware of these problems:

> Charlie locked himself in [Toguchi's] car with a knife and refused to attend school and on another occasion stood on top of a three story building and threatened to jump. The [d]efendants knew or should have known that Charlie was actively attempting to commit suicide since one or more of these events happened on school property and or on days that school was in session. Following both of these incidents Charlie was taken to Queen[']s Medical Center for treatment.

SAC ¶¶ 38–40 (formatting altered; paragraph numbering omitted).

During this time, Toguchi alleges that she expressed concern to individuals at the DOH and to individuals on Charlie's IEP team regarding the insufficiency of the programs in meeting Charlie's needs. SAC ¶ 42. Despite these expressions, Toguchi alleges that the DOH discontinued Charlie's "intensive home therapy" after five months and thereafter "only provided minimal care management services" for Charlie "even though it was clear that Charlie still needed intensive mental health treatment." SAC ¶ 42.

Toguchi alleges that Charlie's behavior continued to decline as he transitioned to his ninth grade year at Roosevelt High School, and that defendants

4

continued to do little or nothing in response to address his escalating problems.
SAC ¶ 47-49. According to Toguchi:

> At the initial IEP meeting at Roosevelt High School, which occurred on August 18, 2011, the Defendants failed and refused to consider or provide the level of intensive and/or residential care that Charlie required based upon his long history of self[-]abusive behaviors and his most recent difficulties adjusting to a new school, which they knew or should have known would place Charlie at great risk of harm.
>
> Following the initial IEP meeting Charlie continued to cut himself and threatened to commit suicide by hanging.
>
> Although [Toguchi] regularly voiced her concerns regarding Charlie's threats to take his own life in emails to the named Defendants and at Charlie's IEP meetings, her pleas and Charlie's threats were not taken seriously by any of the named Defendants.

SAC ¶¶ 47–49 (paragraph numbering omitted).

Charlie's poor school attendance record led to his placement at Home Maluhia, where the DOH initially provided Multi Systemic Treatment ("MST"). SAC ¶¶ 50-51. Even this, however, did not meet Toguchi's expectations because she believed that Charlie required residential treatment. SAC ¶ 51. Regardless, the DOH shortly thereafter terminated the MST, allegedly because, without an IEP, "Charlie could not be in Home Maluhia and be receiving MST at the same time." SAC ¶¶ 52. On the evening of November 6, 2011, the same day that he was released from Home Maluhia (after being there for two weeks), Charlie committed suicide. SAC ¶¶ 52-53.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) permits a motion to dismiss for failure to state a claim upon which relief can be granted. Pursuant to *Ashcroft v. Iqbal*, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* Accordingly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Factual allegations that only permit the court to infer "the mere possibility of misconduct" do not constitute a short and plain statement of the claim showing that the pleader is entitled to relief as required by Rule 8(a)(2). *Id.* at 679.

## DISCUSSION

**I.     Count 1 - Section 504 of the Rehabilitation Act**

Toguchi asserts that defendants, in their official capacities, "violated § 504 of the Rehabilitation Act by denying Charlie adequate, reasonable, and essential

programs and services[,]" and that "[t]his violation and denial of services constituted a deliberate indifference to Charlie's rights guaranteed by the Rehabilitation Act[.]" SAC ¶¶ 62–63. Defendants contend that Charlie was not a person protected by Section 504 of the Rehabilitation Act because he was not disabled pursuant to 29 U.S.C. § 794.[2] As set forth below, the Court concludes that Toguchi has stated a valid prima facie Section 504 claim.

Section 504 of the Rehabilitation Act forbids organizations that receive federal funding from discriminating against those with disabilities. 29 U.S.C. § 794. Specifically, Section 504 provides that "no otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). As such, a threshold inquiry in establishing a prima facie case under Section 504 is whether or not a plaintiff is a "qualified individual with a disability." *Id*. Defendants contend that merely being eligible for special education services does not qualify a person to be a proper plaintiff in a Section 504 action and that a "'qualified handicapped person' must first demonstrate a physical or mental impairment that substantially limits at least one major life activity." Dkt. No. 96 at 25. The Court agrees with this assertion, but

---

[2]While defendants also initially contended that Toguchi failed to plead her alleged status as Charlie's personal representative, they have since withdrawn that portion of their motion.

7

concludes that Toguchi sufficiently pled Charlie's status as a qualified handicapped individual under the Rehabilitation Act.

Section 504 does not precisely define eligibility under the Rehabilitation Act. However, regulations implementing Section 504 define "qualified handicapped person" in relevant part as "a handicapped person . . . to whom a state is required to provide a free appropriate public education under [the IDEA][.]" 34 C.F.R. § 104.3(l)(2)(iii); 45 C.F.R. § 84.3(l)(2). A related regulation defines "handicapped person" as follows:

> Handicapped persons means any person who (i) has a physical or mental impairment which substantially limits one or more major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment.

34 C.F.R. § 104.3(j)(1). "[M]ajor life activities" include "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 34 C.F.R. § 104.3(j)(2)(ii).

Here, the SAC alleges that Charlie had a record of mental impairment that substantially limited his ability to learn and care for himself, which are both major life activities under the applicable regulations. *See* 34 C.F.R. § 104.3(j)(2)(ii). Specifically, the SAC alleges that Charlie, over the course of several years, was cutting himself and threatening suicide. SAC ¶¶ 3, 25, 28, 32, 38, 48. These "self-injurious and potentially suicidal behaviors" substantially interfered with Charlie's attendance at school and required him to be temporarily institutionalized. SAC ¶¶

26, 28. In other words, these behaviors substantially limited Charlie's major life activities. Because these assertions adequately describe Charlie's qualifications for "qualified handicapped individual" status under the Rehabilitation Act, the Court denies defendants' motion to dismiss Count 1.

## II. Count 2 – IIED

In the December Order, the Court recognized that "allegations of IIED are not merely serious, but grave" and "have the real potential to sully the reputations, character, and ethics of those they target." December Order at 11. Thus, the Court cautioned in its December Order that "they are not the type of allegations that one can sufficiently plead by grouping defendants together." December Order at 11. Despite Toguchi's amendments, the allegations in the SAC still group the individual capacity defendants together, rather than individually pleading factual allegations supporting IIED as to each of the individual capacity defendants. Moreover, the allegations fail to allege outrageous conduct as to each or any of the individual capacity defendants in accordance with Hawai'i law. As a result, the Court dismisses Count 2 with prejudice.

"[T]he tort of IIED consists of four elements: '1) that the act allegedly causing the harm was intentional or reckless, 2) that the act was outrageous, and 3) that the act caused 4) extreme emotional distress to another.'" *Young v. Allstate Ins. Co.*, 119 Hawai'i 403, 429 (2008) (quoting *Hac v. Univ. of Hawaii*, 102

9

Hawaiʻi 92, 106–07 (2003)). As the Court noted in the December Order, the Hawaiʻi Supreme Court has set an extremely high bar for those seeking to assert an IIED claim:

> In explaining the type of "outrageous" conduct that makes a claim for intentional infliction of emotional distress actionable, the *Restatement (Second) of Torts* states:
>
> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Ross v. Stouffer Hotel Co. (Hawaiʻi) Ltd., Inc.*, 76 Hawaiʻi 454, 465 n. 12, 879 P.2d 1037, 1048 n. 12 (1994) (quoting *Restatement (Second) of Torts* § 46, cmt. d. (1965)).

As to the factual specificity required for a claim of IIED, the December Order stated that:

> . . . in order to adequately respond to the allegations of serious conduct alleged by Toguchi to justify a claim of IIED, each defendant is entitled to know, before that defendant can be expected to respond, what specific conduct by him or her is alleged to support the IIED claim, when that conduct occurred, and why that conduct rises to the level of outrageous.

December Order at 11-12 (emphasis added).

In its present form, the SAC again fails to provide the minimal factual content that would allow the Court or an average community member to draw the reasonable inference that each, or even any, of the individual capacity defendants is liable for IIED. Like the FAC, the SAC does not specify what each defendant did, when it was done, and why that conduct was outrageous.

Moreover, the SAC fails to allege facts that meet the high standard of outrageous conduct necessary for an IIED claim under Hawai'i law. The SAC generally alleges the insufficiency of services to Charlie as the primary basis of Toguchi's IIED claim. The Court acknowledges that these allegations, if taken as true, present an undeniably frustrating situation for a parent in the context of this case. However, this Court must adhere to the high standard provided by Hawai'i law, and general allegations that the individual capacity defendants failed to perform their duties diligently are not "so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Ross*, 76 Hawai'i at 465 n. 12, 879 P.2d at 1048 n. 12 (internal quotation marks and citation omitted). In short, Toguchi fails to allege any outrageous conduct within the meaning of Hawai'i law, by any of the individual capacity defendants, necessary to sustain an IIED claim.

For the foregoing reasons, Count 2 fails to state a claim upon which relief can be granted.

**CONCLUSION**

The Court hereby denies defendants' motion to dismiss Count 1 (Dkt. No. 96) and grants the individual capacity defendants' motions to dismiss Count 2 (Dkt. Nos. 97 and 98).

IT IS SO ORDERED.

DATED: April 17, 2015 at Honolulu, Hawai'i.

Derrick K. Watson
United States District Judge

Monica Toguchi, et al. v. Kathryn Matayoshi, et al.; CV 13-00380 DKW/KSC; ORDER DENYING DEFENDANTS' MOTION TO DISMISS COUNT 1 AND GRANTING DEFENDANTS' MOTIONS TO DISMISS COUNT 2

12